544 P.2d 1270 (1975)
J.T.P., a juvenile, Appellant,
v.
The STATE of Oklahoma, Appellee.
No. O-75-440.
Court of Criminal Appeals of Oklahoma.
December 30, 1975.
Wesley B. Bennett, Sallisaw, for appellant J.T.P.
Larry Derryberry, Atty. Gen. for the State of Okl., Oklahoma City, and John W. Russell, Jr., Dist. Atty., Sallisaw, for appellee.

*1272 OPINION
BRETT, Presiding Judge:
J.T.P., a juvenile, appeals[1] from an order of the Juvenile Division of the District Court, Sequoyah County, waiving jurisdiction over him and empowering the State to prosecute him as an adult for the crime of Murder.
On the Saturday morning of April 5, 1975, an investigation was launched into the death of Henry Ellis whose body was discovered in his home near the City of Sallisaw, Oklahoma. Ellis was an old man who had been killed in a particularly brutal way, an ice pick having been driven deep into his head. J.T.P., 15 years old, was arrested late that same day. On April 8, the following Tuesday, a petition was filed in the Juvenile Division of the District Court, Sequoyah County, alleging that J.T.P. was a child under the age of 18 years who was delinquent by reason of having committed acts in concert with another person which if committed by an adult would constitute the crime of Murder in the First Degree, specifically that he had robbed and murdered Henry Ellis. The petition requested that he be tried for *1273 that crime as an adult. On April 8, also, J.T.P. appeared before a judge for the first time since his arrest. The minute of the court reflects that he was present with his father but without counsel. That initial appearance was continued until Thursday, April 10, to allow time for the appointment of counsel. That proceeding was held on the date set and concluded with the judge, upon the motion of J.T.P.'s newly appointed attorney, entering an order committing him to a State hospital for the purpose of mental observation and evaluation. He was returned from the hospital to the custody of the Sheriff of Sequoyah County on April 23, 1975. Subsequently, a hearing was held on the question of whether the Juvenile Court should relinquish its exclusive jurisdiction over him.
The certification hearing was begun on May 19, 1975, and concluded on May 30, 1975, having been continued to that later date to permit the State to secure the presence of witness Charles Bettis, an Arkansas police officer.
At that hearing the Juvenile Court heard testimony from five witnesses for the State, and three for the appellant. Of the five State's witnesses, four were law enforcement officials whose testimony concerned the circumstances and events transpiring between appellant's arrest on Saturday and his appearance before a magistrate on Tuesday. The remaining State's witness was State psychiatrist Dr. R.D. Garcia who gave his expert opinion on appellant's mental capacity.
The evidence was that appellant in the company of three others was arrested late in the evening of April 5 by a trooper of the Oklahoma Highway Patrol and a Fairfax, Oklahoma, police officer. A warrant had issued for the arrest of appellant, and those officers had acted upon information they had received through a teletype message. Nothing in the record reveals why suspicion had focused upon appellant or what information had caused the warrant to be issued. He was initially incarcerated in jail at Fairfax. Rudy Briggs, an investigator for the District Attorney's Office at Sallisaw, testified that he and Jim Rinehart of the Sequoyah County Sheriff's Office drove to Fairfax and transported appellant and the other persons to Sallisaw. They arrived at Fairfax at approximately 1:30 in the morning of April 6, and returned to Sallisaw at 5:00 or 5:30 a.m. After the party arrived in Sallisaw, appellant was immediately transported by automobile to Stillwell where he was placed in the Adair County Jail. Briggs testified that he brought appellant from Stillwell back to Sallisaw several hours later at approximately 9:30 or 10:00 Sunday morning. There is agreement among the testimony of the Oklahoma law enforcement officials that appellant was questioned in Sallisaw Sunday and that his father had been notified and was present during at least part of that questioning. It cannot be determined from their testimony, however, when appellant's father was notified that his son was in custody.[2] Neither can it be determined when the period of questioning *1274 began, when it ended, or whether the juvenile made any expression of desire either to assert or to waive his constitutional rights. The events of the following day, Monday, while not entirely clear, are less obscure than the events of Sunday. W.C. Gilliam, of the Sequoyah County Sheriff's Office, testified that sometime late Monday morning he transported appellant to Ft. Smith, Arkansas, where he was given a lie detector test by a Ft. Smith police officer. Appellant's father was allowed to accompany him to Ft. Smith. Captain Charles Bettis, a police officer with the Ft. Smith, Arkansas, Police Department, testified that it was he who administered the polygraph examination to appellant in Ft. Smith on Monday. Bettis testified that prior to giving the polygraph examination he explained the test procedure to both the boy and his father. His father consented to the procedure. Bettis also testified that he informed the boy of his Miranda rights and that the boy responded that he understood those rights and wished to take the examination. Following that procedure, everyone including the appellant's father was required to leave the room and Captain Bettis, alone with appellant, administered the examination. He testified that at its conclusion when the "charts were outlined and while he was sitting there, I showed what the reactions were on it and he just merely dropped his head and said `yes'" (Tr. 86-87). Appellant then gave a statement which confessed his part in the murder of Henry Ellis and which was taken down in writing by Bettis. There is testimony that his father was allowed to talk to him following the lie detector examination and before Captain Bettis took the written statement. Whether his father was present at the time appellant gave the statement, however, cannot be determined from the record. Captain Betts testified on that point that he simply did not know, stating "... before I took the written statement he left the office and I don't know whether he came back in or not, I will be honest with you." (Tr. 93) The statement that Captain Bettis took was admitted into evidence over the objection of the appellant's attorney. The appellant's father was called as a witness and testified that he could neither read nor write. He testified that he waited in the hall in Ft. Smith while his son was with Captain Bettis because "the Undersheriff said that just him and J.T. was the only ones allowed in there." (Tr. 107) He also testified that the only time he saw his son was "when they took a break and he come out to get a drink of water. I didn't talk to him." (Tr. 106)
The remaining witness for the State, Dr. R.D. Garcia, a psychiatrist, testified that he examined J.T.P. during his commitment to Eastern State Hospital. Asked to explain the results of psychological tests performed upon the juvenile, Dr. Garcia responded thus:
"The results of the psychological testing performed by our clinical psychologist indicated in the first information that he could speak in the most relevant, speaking relevantly, no, no deviate manifestations in his behavior; it told a story about his life and also pertaining to the incident, and following the testing we have the following: We have the psychometric or intelligence test, indicating an IQ rating of 72, which is in the category of borderline mental retarded category, with a mental level of twelve, thirteen, fourteen and fifteen. In the social part of the inventory ARCI, and that means additional research, and he scored extremely high and well within the critical limits of examination. In the lower shots he was quite realistic, no indication of any bazaar, no diviate, no confabulatory responses." (Tr. 12-13)
*1275 Dr. Garcia testified that it was his opinion first, that appellant was not insane according to State law, second that he knew right from wrong at the time of the commission of the crime, "with the exception of some inference from the outside force in the form of alcoholic beverage and the spraying paint sniffing," (Tr. 14) and that he was "quite being able to talk or communicate with anyone." (Tr. 15)
James Thomas Reese testified for appellant that he had been acquainted with him from 1969 until 1972 when appellant was a student at the Seneca Indian School where the witness was a psychological consultant. His testimony was that psychological tests conducted on the boy at that time had shown him to have an IQ of 85. Appellant had not been classified as a retarded child at that time, however, being diagnosed as suffering from a learning disability, but having the potential for average intelligence. The witness testified that at the time he knew the appellant the boy was very impulsive and incapable of assessing the consequences of his actions, but had committed no transgression at the school beyond ordinary mischief.
Brenda Martin, a counselor at the junior high school in Sallisaw which appellant had attended, also testified for him. She testified that he came to her attention because he failed the eighth grade and needed special assistance with his school work. For that reason he was placed in special education classes. She described him as a good, quiet boy who responded gratefully to special help with school work.
This case raises basic questions about the admissibility and quantum of evidence in a hearing to certify a child to be tried as an adult, and the procedure to be followed prior to such hearing. General guidelines for the procedure to be followed when a child who has allegedly committed a felony offense is taken into custody are set forth in the Appendix hereto.

THE CERTIFICATION HEARING
Before turning to the specific issues raised by appellant, it is helpful to consider the nature of the certification hearing within the statutory framework of the Oklahoma Juvenile Court Act. The emphasis of the Juvenile Court must be upon the prospects for the rehabilitation of the youthful offender within the juvenile system. The provision within the Act, 10 O.S. 1112(b), which permits the Juvenile Court to waive its exclusive jurisdiction and certify a child to stand trial as an adult contemplates the exceptional case in which the child is not amenable to treatment under the juvenile facilities and programs available to the court.
The consequences to the juvenile of the court's decision to permit him to be tried as an adult may be tremendous, as this case well illustrates. We have recognized that such a decision may be the most severe sanction the Juvenile Court can impose. In In re Smith, Okl.Cr., 326 P.2d 835 (1958), we stated:
"... Certainly no graver concern can confront a juvenile court than that of certification of a child for prosecution for the crime of murder... .
* * * * * *
"Due process, in such cases, dictates that the court should determine the issues of such cases according to established rules of law... ." 326 P.2d at 840.
More recently we stated that a certification hearing in Juvenile Court is "comparable in seriousness to a felony prosecution." Bruner v. Myers, Okl.Cr., 532 P.2d 458, 461 (1975).
Because of its critical importance, a certification hearing must measure up to the essentials of due process and fair treatment[3] which requires a hearing before *1276 the juvenile judge after adequate notice to the child and his parents; representation by counsel who has been given access to all records or reports which the court may consider, and a statement of reasons for certification sufficient to allow meaningful review of the court's determination.

THE ADMISSIBILITY OF THE CONFESSION
The appellant contends that it was reversible error for the Juvenile Court judge to admit into evidence against him, at the certification hearing, a confession which he asserts was extracted from him in violation of his rights.
When we consider the critical nature of the rights adjudicated at such a hearing, the clear requirement that it be conducted in accord with basic tenets of due process, and the statutory requirement of 10 O.S., § 1112(b), that the juvenile judge consider the prosecutive merit of the complaint, we are compelled to conclude that there is no rational basis for a rule which would permit an illegally obtained confession to be introduced into evidence at a certification hearing when the same confession would be clearly excluded at a delinquency hearing or a criminal trial. In addition we believe it to be contrary to the fundamental policy of the juvenile court system to permit a child within its jurisdiction to stand trial as an adult with no consideration of whether an admission or confession obtained from him was taken under circumstances which make its trustworthiness suspect. We hold that it is the duty of the judge of the juvenile court to deny admission into evidence at a certification hearing those statements of a child, obtained in violation of constitutional or statutory rights, which are inadmissible in delinquency or criminal proceedings. Cf. People v. Morris, 57 Mich. App. 573, 226 N.W.2d 565; In re Anonymous, Juvenile Court No. 6358-4, 14 Ariz. App. 466, 484 P.2d 235; State v. Piche, 74 Wash.2d 9, 442 P.2d 632.
We now turn to the question of whether the confession in this case was illegally obtained and hence erroneously admitted into evidence against appellant.
In Re Gault, 387 U.S. 1, 51, 87 S.Ct. 1428, 1457, 18 L.Ed.2d 527, 560, the Supreme Court emphasized that admissions and confessions of children require special caution pointing out, "authoritative opinion has cast formidable doubt upon the reliability and trustworthiness of confessions by children." The Court held that the privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults and concluded with this statement:
"... If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." 387 U.S. at 55, 87 S.Ct. at 1458.
Two sections of the Oklahoma Juvenile Court Act, 10 O.S., § 1107 and § 1109, reflect legislative concern for the special problems inherent in the arrest, detention and interrogation of children, and strong legislative intent to assure protection of the rights of children in such circumstances. Appellant challenges the legality of the confession elicited from him on the grounds that the statement was taken without compliance with the provisions of those statutes.
Section 1109 provides in pertinent part:
"(a) No information gained by questioning a child shall be admissible into evidence against the child unless the questioning about any alleged offense by any law enforcement officer or investigative *1277 agency, or employee of the court, or the Department is done in the presence of said child's parents, guardian, attorney, or the legal custodian of the child, and not until the child and his parents, or guardian, or other legal custodian shall be fully advised of their constitutional and legal rights, including the right to be represented by counsel at every stage of the proceedings, and the right to have counsel appointed by the court and paid out of the court fund if the parties are without sufficient financial means; . .."
This provision clearly establishes an automatic and mandatory rule. A failure by the prosecution to show compliance with its requirements will render the admission or confession of a child inadmissible into evidence against him without the necessity of further inquiry into circumstances. No custodial interrogation of a child may proceed until both the child and his parents have been fully advised of their constitutional and legal rights; nor may such interrogation be conducted outside the presence of the child's parent or guardian or attorney.[4] There is no evidence in this case before us now that appellant's father, who testified that he could neither read nor write, was ever advised prior to his appearance before the magistrate on Tuesday of his son's right to have an attorney appointed. Both the child and his parent must be advised. Furthermore, contrary to the statutory requirement, appellant was interrogated without the supportive presence of his parent or attorney. The statement which is the product of that interrogation must be excluded from evidence.
The second statute which the juvenile asserts was violated by the manner of his detention and interrogation is Section 1107, which provides in pertinent part:
"(a) Whenever a child is taken into custody, unless it is impracticable or inadvisable or has been otherwise ordered by the court, he shall be released to the custody of his parent, guardian or custodian, upon the written promise of such parent, guardian or custodian to bring the child to the court at the time fixed. If not so released, such child shall be taken immediately to the court, or to the place of detention or shelter designated by the court. Pending further disposition of the case, a child whose custody has been assumed by the court may be released to the custody of a parent or other person appointed by the court, or be detained in such place as shall be designated by the court, subject to further order.
"(b) Nothing in this act shall be construed as forbidding any peace officer or employee of the court from immediately taking into custody any child who is found violating any law or ordinance, or whose surroundings are such as to endanger his welfare. In every such case the officer taking the child into custody shall immediately report the fact to the court, and the case shall then be proceeded with as provided in this act."
In construing a similar Federal Statute, the Court in United States v. Glover, 372 F.2d 43 (2nd Cir.1967), made a statement particularly appropriate to the facts of this case:
"Miranda v. State of Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1965), held that `the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' In the case of a juvenile, compliance with the mandate of the Juvenile Act should be the minimum requirement of such safeguards. Treatment of an accused *1278 juvenile after arrest as a chattel in the possession of the officers, deliverable at will to the inspectors' offices for interrogation is a plain departure from the command of the statute for forthwith production of the juvenile before a magistrate. Statements taken while the statute is being ignored in this fashion must be held inadmissible." 372 F.2d at 47.
Section 1107 indicates a legislative policy that children be treated differently from adults under arrest because they are, presumptively, inexperienced and highly vulnerable to suggestion and intimidation. There is no suggestion in that statute that a child accused of a crime may be detained by the police for the purpose of interrogation or any other purpose longer than the time necessary to bring him before a judge who will explain and protect his rights.
There is, in the record of appellant's hearing, much discussion of whether an officer had reported his detention to a district judge, as required by Section 1107. The question of when and if a judge was called on Saturday or Sunday, however, becomes wholly irrelevant in view of the events which transpired the following Monday morning when instead of being taken before a judge of the District Court for arraignment the 15-year-old juvenile was transported to the neighboring state of Arkansas to be interrogated by a Ft. Smith police officer. That conduct was the most blatant violation of Section 1107, and constitutes a second reason why the statement obtained must be denied admission into evidence.

THE CERTIFICATION ORDER
Appellant also contends that the certification order entered by the judge is without sufficient basis in the evidence presented and is contrary to law.
The decision that a child is unfit for rehabilitation within the juvenile system is one within the discretion of the juvenile judge. That discretion, however, must be exercised within the bounds of due process which requires not only the procedural regularity which we have discussed, but substantial evidence against the child's claim to the benefits of juvenile treatment.
Title 10 O.S. 1112(b), provides certain guidelines which the court must consider in making its determination about the appropriateness of juvenile or adult treatment for the child. The pertinent part of that statute is as follows:
"(b) If a child is charged with delinquency as a result of an offense which would be a felony if committed by an adult, the court shall consider the following guidelines:
"1. The seriousness of the alleged offense to the community;
"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
"3. Whether the offense was against persons or property, greater weight being given to offenses against persons especially if personal injury resulted;
"4. Whether there is prosecutive merit to the complaint;
"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults;
"6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.
"7. The record and previous history of the juvenile, including previous contacts with community agencies, law enforcement agencies, schools, juvenile courts and other jurisdictions, prior periods of probation or prior commitments to juvenile institutions; and
"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile if he is found to be guilty of the alleged offense, by the use of procedures and facilities *1279 currently available to the juvenile court;
and after full investigation and a preliminary hearing, may in its discretion continue the juvenile proceeding, or it may certify such child capable of knowing right from wrong, and to be held accountable for his acts, for proper criminal proceedings to any other division of the court which would have trial jurisdiction of such offense if committed by an adult."
It is, of course, not necessary that the court's consideration be arithmetically proportioned among these eight factors or that each of the statutory factors be clearly decided against the claim of the child. We interpret Section 1112(b) to require two ultimate findings as prerequisite to a valid certification order. The first of these is a finding that there is prosecutive merit to the complaint, which statutory phrase we construe to require a finding that a crime has been committed and that there is probable cause to believe that the accused child committed it. The second ultimate finding required is that the child is not a fit subject for rehabilitation by the facilities and programs available to the juvenile court.[5]
Unlike that of certain other jurisdictions, Oklahoma's Juvenile Court Act does not exclude major crimes from Juvenile Court jurisdiction. There is, therefore, no presumption built into the Act that a child who has committed a very serious offense is not receptive to rehabilitative treatment.
The order, which appellant challenges as insufficient in this case, was entered at the conclusion of the evidence taken on May 30 and consists of this statement:
"... Under Title 10, Section 1112 of the Oklahoma Statutes, 1974 Supplement, the statute reads that if a child is charged with delinquency, they set out certain guidelines, and each one of the guidelines as set out by the statute, I feel like they have been met. Now, as to the nature of this crime, it falls under the new section of the statute as to murder one. The statute reads that the Court may certify a child that's done wrong and to be held accountable for his acts for proper criminal proceedings to any division of the Court which would have trial jurisdiction of such offense if committed by an adult. The Court feels that the State definitely has met those guidelines or requirements, the Court feels that the State has met that burden. I feel that the juvenile is of average intelligence and maturity for his age, based on the testimony of the doctors and based on the testimony as to his school work. The Court feels that he falls within that requirement. As to previous record, it didn't appear to the Court that he actually has any serious previous juvenile record of delinquency, although he has had some problems with school. I feel that the cause of the nature of this case and the type of case that it is that the case must proceed and that he must proceed as an adult. It is the feeling of the Court and the order of the Court that the juvenile, ... should be certified and is certified as an adult and that he should stand trial for the alleged crime that has been brought against him in this juvenile petition and that he should proceed as an adult. I feel that under the Statutes of the State of Oklahoma that the juvenile, ... is entitled to a full and complete preliminary hearing the same as any adult would be. The Court further feels that the matter should be set down just as soon as possible for a preliminary hearing and at that time let the examining magistrate rule again on the admissibility of the evidence...."
*1280 The record does not reflect competent evidence sufficient to support this finding.
We reverse the order of the Juvenile Court and remand this case for further hearing with instructions to examine first the question of whether there exists evidence sufficient to show commission of the crime and probable cause to believe that appellant committed the crime charged, beyond that of the illegally obtained confession, and next, whether there is sufficient evidence to comply with the guidelines set forth herein.
BUSSEY and BLISS, JJ., concur.

APPENDIX A
These are guidelines for procedures to be followed when a child is taken into custody who has allegedly committed a felony offense and is subject to certification to stand trial as an adult.
1. When a child is taken into custody his parent or guardian must be notified of his detention, without unnecessary delay, and he must be released to the custody of that parent or guardian, or an attorney or other custodian upon the written promise of such person to bring the child to the court at the time fixed unless the circumstances of the case make release inadvisable or impracticable. Title 10 O.S., § 1107.
2. If the child is not released, he must be taken immediately before a judge of the District Court that the judge may make a preliminary inquiry into the reasons for detention and explain the child's rights, or he must be taken immediately to the place of detention or shelter designated by the court. If no judge be available locally, the person having the child in custody must immediately report that detention to the presiding judge of the administrative district or, if the presiding judge be unavailable, to any judge regularly serving in the district. Title 10 O.S., § 1103(a); 10 O.S., § 1107.
3. If the child is not taken immediately before a judge of the District Court, he shall be detained no longer than is necessary to bring him before a judge for the purpose of allowing the judge to make preliminary inquiry into the reasons for his detention and to explain and protect his rights. Title 10 O.S., § 1103(a); 10 O.S., § 1107.
4. The detained child must be kept separate from hardened adult offenders. No child under the age of sixteen (16) years shall be confined in any police station, prison or jail unless the child is twelve (12) years of age, or older; and he is placed in a room entirely separate from adults, and the consent of the judge or director has been obtained. Title 10 O.S., § 1107.
5. A child in custody may not be interrogated about any alleged offense in the absence of his parent, guardian or attorney and not until both the child and parent or guardian have been fully advised of their constitutional and statutory rights. Title 10 O.S., § 1109.
6. Juvenile Court proceedings are initiated by the filing of a verified petition with the Juvenile Division of the District Court in accordance with the provision of 10 O.S., § 1103.
7. The petition must be sufficient to give notice of the specific charge or factual allegation to be considered by the court, and the relief sought at the hearing on the petition.
8. Both the child and his parent or guardian must be given timely notice of the hearing on the petition and the relief sought. Title 10 O.S., §§ 1103, 1104, 1105.
9. Proceedings to certify the child to stand trial as an adult may be initiated by a request within the original petition or an amendment thereto, by a motion filed subsequently, or by the court's own motion after investigation, provided that timely notice is given the child and his parents or guardian of the issue to be considered at the hearing.
10. If certification is to be considered, it is the duty of the Juvenile Court to proceed in accordance with the guidelines set forth in this opinion.
*1281 11. All reports, records and other material which may be considered by the court in its investigation must be made available to the child's counsel at the certification hearing.
12. The child is entitled to proceedings on the issue of certification which comport with the basic requirements of due process and the guidelines set forth in this opinion, and it is not necessary that a separate and distinct preliminary hearing be held prior to such certification proceedings. However, in the event the juvenile is certified to stand trial as an adult, then he shall be entitled to a preliminary hearing or examination prior to arraignment, unless properly waived.
13. At the conclusion of the certification proceeding, the court must enter its written order, based upon all the evidence, either certifying the juvenile to stand trial as an adult, or declining to certify but retaining jurisdiction of the juvenile, or discharging the juvenile.
NOTES
[1] Title 10 O.S. 1971, § 1123, was amended by the Oklahoma Legislature and became effective on May 23, 1975 (prior to the order of the District Court certifying appellant as an adult). This amendment authorized an appeal by a juvenile from an order certifying him to stand trial as an adult. Subsequent to the Legislative Amendment, this Court adopted Rule VIII on July 2, 1975, which was published in the Oklahoma Bar Journal on the 12th day of July, 1975.
[2] The father's testimony on this point under questioning by the prosecutor was this:

"Q. (Mr. Carlisle) `You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during the questioning.' Do you remember that?
"A. (The witness) Yes, I remember when we was around there. You was supposed to be down there by one o'clock and it was about three or three thirty.
"Q. I don't recall that.
"A. I do.
"Q. That sounds about right. I will ask you if you remember this: Do you remember us advising him that he could have a lawyer if he wanted one during the questioning?
"A. Now, too much was going on. I don't know what part of it  I remember you asking him one time, `Did you ever hear anybody go "ah?"'
"Q. Go what?
"A. In there when you asked him 
"MR. BENNET: If the Court please, he is not answering the question. It isn't responsive.
"THE COURT: It isn't responsive.
"Q. (Mr. Carlisle) Did I ask him or tell him that if he wanted a lawyer, that one would be appointed for him before questioning, if he wished?
"A. (The Witness) No, I don't remember that.
"Q. You don't remember that?
"A. No, sir." (Tr. 103-104)
[3] Kent v. United States, 383 U.S. 541, 562, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84, 98 (1966). Kent was decided on the basis of the District of Columbia Juvenile Court Act. Any lingering doubt that the case nonetheless announced procedural guarantees of constitutional dimension was dispelled by the Court's subsequent decision in Re Gault, 387 U.S. 1, 12, 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[4] A similar provision in the Colorado Children's Code, 1971 Perm.Supp., C.R.S. 1963, 22-2-2(3) (c), has been construed to require more than mere physical presence of a parent, the parent must be in a position to provide effective guidance and advice. People in Interest of L.B., 33 Colo. App. 1, 513 P.2d 1069 (1973).
[5] See, P.H. v. State, Alas., 504 P.2d 837; In re Johnson, 17 Md. App. 705, 304 A.2d 859; In re Patterson, 210 Kan. 245, 499 P.2d 1131.