**V. D. C., a juvenile, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. J-76-826.**

Court of Criminal Appeals of Oklahoma.

Feb. 23, 1977.

Randolph S. Meacham, Meacham, Meacham & Meacham, Clinton, for appellant.

Richard L. Dugger, Dist. Atty., James R. Wright, Jr., Asst. Dist., Atty., Custer County, for appellee.

### OPINION

BRETT, Judge:

Appellant, V. D. C., a juvenile, appeals from an order of the Second Judicial District certifying him to stand trial as an adult for the offense of Grand Larceny.

The evidence at the certification hearing established the following set of facts. At approximately 11:30 a. m. on September 1, 1976, Eugene and Hallie Mae Marvel left the radiator shop which he owned and in which she worked to go to lunch. When they left, they locked all the doors except for the door which connected their shop with an adjoining service station. Mrs. Marvel took her purse with her to lunch. They returned from lunch at approximately 12:25 p. m., at which time Mr. Marvel unlocked the doors to the shop and again left the shop to pay a bill. Mrs. Marvel put her purse down inside the shop and went outside into an area within ten feet of the building to pick up some small rocks. She returned to the shop at 12:35 p. m. and noticed "a coke, a brand new one, you know, full of ice," sitting on a workbench in the shop. Mrs. Marvel testified that the drink had not been there when she and her husband had returned from lunch approximately ten minutes earlier.

When Mr. Marvel returned to the shop at approximately 12:45 p. m., the two discussed the cup on the workbench and realized that neither of them had brought it into the shop. They looked around to see if anything was missing, and Mrs. Marvel discovered that her red billfold containing at least $125.00, including two $2.00 bills, at least 12 Joseph E. Barr dollars, and a Mexican peso, was missing. They observed that there were some footprints in the slag which had accumulated on the floor of the shop, and Mr. Marvel put an oil can over one of the footprints in order to preserve it. A few minutes after 12:45 p. m. the couple called the police.

Dan Sauer, who ran the service station which adjoined the Marvel's radiator shop, testified that at approximately 11:00 to 11:30 a. m. he had seen the juvenile walking in front of his station headed north. He stated the juvenile, whom he had described to the police as a "short husky colored boy, and wearing blue jean and shirt," was "just walking along." Mr. Sauer further testified that he had seen no one go into the radiator shop while the Marvels were at lunch.

Virginia Viola Watson, who worked at Daniels Drive In, testified at the hearing that she had sold the juvenile a twenty-five cent Coke with a lid at approximately 11:30 a. m. on September 1, 1976. She testified that on the day in question the juvenile was wearing a navy jersey with white numbers on it. The drink left that the radiator shop was in the kind of container that Daniels Drive In used.

Shortly after 2:00 p. m. on September 1, Officer Charles Day, Deputy Sheriff Roy

Ezzell, and Alvin DeWade Langley saw the juvenile several blocks away from Marvel's Radiator Shop. They noticed that he was wearing tennis shoes, interviewed him and let him go. After he left, the officers noticed that the shoes the juvenile was wearing left prints which looked to them like the prints they had seen in the Marvel's radiator shop. A few minutes later they saw the juvenile sitting on a porch of a house and they approached him, asking him to come with them. At that point he started running. The officers followed him, caught him, arrested him and took his shoes for evidence. Officer Langley testified that they picked up the juvenile on the basis of the information they had received from Mr. Sauer and Ms. Watson, that he had been seen in the area earlier that morning wearing tennis shoes.

After taking the shoes Officer Langley and Sheriff Richard Mueller took them back to the radiator shop to compare them with the print on the floor of the garage. According to Officer Langley, the two observed that the shoe and the print were, "approximately the same size, bore the same pattern, and also bore some resemblance as far as wear was concerned." On cross-examination the officer testified that the photograph of the print left in the radiator shop did not show a complete footprint. He further testified that the print looked like one left by a narrow foot, and that the shoes which had been taken from V. D. C. were of medium width. He further stated that they did not check the shoes for slag or any other particles, and that he could not positively identify the footprint as having been made by the juvenile.

The juvenile was arrested at approximately 2:15 to 2:30 in the afternoon on September 1. When he was searched prior to being booked, he was found to have on his person a small coin purse which contained some change. No other money was found on the juvenile.

■ At approximately 8:00 a. m. the following day John Carl Peoples, a police officer, was asked by the juvenile's uncle to go to the juvenile's cell, so the juvenile could tell him something. The juvenile was not given his rights; nor were his parents or an attorney present. It appears from the record that the juvenile had been held since his arrest without having been told of his rights, without having talked to his parents, and without having been given the right to counsel.[1]

Officer Peoples testified that when he went to the juvenile's cell, the juvenile told him he had seen another person, whom he named, throw a red purse or billfold into a trash can near the Marvel's radiator shop. When Officer Peoples went to the described trash can, he found the red billfold.

No attempt was made to check the contents of the cup which had been left in the radiator shop; nor was it checked for fingerprints. Neither was the billfold checked for fingerprints.

The State introduced no other evidence regarding the prosecutive merit of the case. In the second part of the hearing the State introduced evidence to show that the juvenile was not amenable to rehabilitation within the juvenile system.

The juvenile alleges two assignments of error: the first that there was insufficient evidence produced at the certification hearing to show the commission of a crime and that there was probable cause to believe that the juvenile had committed the crime charged, and the second that there was insufficient evidence introduced in the certification hearing to comply with the guidelines set forth by the statutes of the State of Oklahoma and the case-law of the State of Oklahoma to certify a child to stand trial as an adult.

In *J. T. P. v. State*, Okl.Cr., 544 P.2d 1270 (1975), this Court interpreted 10 O.S.Supp. 1974, § 1112(b), as requiring two ultimate findings as prerequisite to a valid certification order. The first of these findings is that there be prosecutive merit to the complaint, and the second is that the child not

---

1. V. D. C.'s statement is clearly inadmissible under the provisions of 10 O.S.1971, § 1109.

be a fit subject for rehabilitation by the facilities and programs available to the Juvenile Court. In *J. T. P. v. State,* supra, we stated that a finding of prosecutive merit in a juvenile case required findings that a crime had been committed and that there was probable cause to believe that the accused child committed it. The juvenile does not argue that there was no crime committed; however, he does argue that there was no probable cause to believe that he committed the crime, and we are forced to agree. According to uncontroverted testimony, the crime took place sometime during an approximately ten minute period between 12:25 p. m. and 12:35 p. m. on September 1, 1976. A "short husky colored boy, and wearing blue jeans and shirt," was seen walking down the street in front of the scene of the crime an hour to an hour and a half prior to the time the crime occurred. There was also testimony that the juvenile purchased a twenty-five cent Coke with a lid on it approximately one hour before the crime occurred. Footprints made by someone wearing tennis shoes were made at the scene of the crime, and the juvenile was wearing tennis shoes. It stretches the court's credulity to imagine that on a warm September day a 16-year-old boy could purchase a soft drink, carry it around for a full hour and then leave it at the scene of a crime still full of Coke and ice.

It was never even established whether the soft drink left in the radiator shop was the same kind which the juvenile purchased an hour earlier. Furthermore, walking by the place where a crime occurred an hour to an hour and a half prior to the occurrence of the crime is certainly a tenuous connection with the crime. No attempt was made to take fingerprints either from the paper cup found at the scene of the crime or from the stolen billfold, and the confiscated tennis shoes were not checked to determine whether they had picked up particles of the slag material from the radiator shop floor. Although approximately $125.00 was stolen, when the juvenile was picked up by the police an hour and a half to two hours after the commission of the crime, he was found to possess only a change purse containing a few cents.

The most credible link between the juvenile and the crime was that the juvenile was wearing tennis shoes which were "*approximately* the same size, bore the same pattern, and also bore *some* resemblance as far as wear was concerned." (Emphasis added) One police officer testified that the juvenile was arrested solely because he was wearing tennis shoes. The Marvels did not notice the tracks in their shop until they realized that Mrs. Marvel's billfold and money had been stolen. Therefore, they could not be sure whether the tracks had been made at the time the crime was committed or at some point during the time they were gone to lunch. Officer Langley testified that he could not be certain that the photograph of the print taken from the radiator shop was made by one of the shoes taken from the juvenile. We have reviewed the photograph of the footprint and we find it is so incomplete that it would be extremely difficult to determine that it was made by a particular shoe. Therefore, we hold there is not sufficient evidence to show probable cause that the juvenile committed the crime.

As we find that there is insufficient evidence to warrant the threshold finding of prosecutive merit, we need not reach the question of whether there was sufficient evidence introduced at the certification hearing to find that the juvenile was not amenable to rehabilitation within the juvenile system.

We *REVERSE* the order of the Juvenile Court and *REMAND* this case for dismissal on the basis that there was no probable cause to believe that the appellant committed the crime charged.

BUSSEY, P. J., and BLISS, J., concur.