Carey Lonnell **BRESHERS,**
Jr., Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–77–96.

Court of Criminal Appeals of Oklahoma.

Dec. 2, 1977.

Barry Albert, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Harold T. Garvin, Jr., Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Judge:

Appellant, Carey Lonnell Breshers, Jr., hereinafter referred to as defendant, was charged, tried to a jury, and convicted in the District Court, Oklahoma County, Case No. CRF–76–1729, for the offense of Murder in the Second Degree, in violation of 21 O.S.Supp.1973, § 701.2. His sentence was fixed at an indeterminate sentence of from ten (10) years to life imprisonment pursuant to 21 O.S.Supp.1973, § 701.4. From said judgment and sentence the defendant has perfected his timely appeal to this Court.

The evidence adduced at trial revealed that on February 16, 1976, a young black male, whom Mrs. Reba King, wife of the deceased, identified in court as the defendant, came to the door of the King's rural home, two and a half miles west of Jones, Oklahoma, in Oklahoma County, at approximately 12:15 p. m. Defendant asked Mrs. King if her husband were home. Defendant told the Kings that he was looking for his runaway Holstein calf, and asked if they had seen one. The defendant then asked for a drink of water, and after receiving it, used the telephone and then walked out of the house. He proceeded north behind the barn, which was approximately 40 feet from the house. He thereafter returned to the house and told the Kings he had found his calf but needed rope to lead it back home. The deceased, Mr. Clyde King, told the defendant that he did not have any rope but that he could probably find something for him to use. Mr. King and the defendant then went to a shed where King gave the defendant a belt, identified by Mrs. King as State's Exhibit No. 1, with which to lead his calf. King stood by the shed as the defendant walked north to a fence row and then turned east. Defendant carried a rifle during this entire time, and Mrs. King identified State's Exhibit No. 3, a 30–30 lever action Winchester, as appearing to be similar to the gun which defendant had in his possession on that day.

From her front window, Mrs. King observed the defendant walk along the fence row for approximately 40 yards. When the defendant reached a point approximately 80 yards from where Mr. King was standing by the shed, Mrs. King observed the defendant whirl around to his left, bend over slightly and shoot in the direction of the deceased. Mrs. King testified that the defendant turned and shot simultaneously. Because the barn blocked her view of her husband, Mrs. King ran to a north window and saw her husband lying on the ground where he had been standing. She then ran outside to her husband, but upon seeing the defendant running toward the house, without the rifle, she went back into the house,

locking the door behind her, and called for help. The defendant got to the front porch door and yelled to Mrs. King that he needed to use the phone because he had shot his calf. Mrs. King replied that she had seen what he had done, that she had a gun and that she was calling the police. Mrs. King then observed the defendant run north from the house, and did not see him again that day. Following this testimony, Mrs. King made a blackboard diagram of the farm and explained the topography of the land.

On cross-examination Mrs. King stated that the defendant was polite, used no profanity, and that his demeanor and conduct were normal. She related that she heard one gunshot but did not see her husband fall. She also related that there was nothing taken from her husband's body, and no theft of personal property from the premises.

The parties then stipulated that Officer Ercanbrack of the Oklahoma City Police Department arrived at the scene and secured the area until various other units of the police department arrived.

Officer Bruce Knox, a photographic technician for the Oklahoma City Police Department, stated that he took photographs of the scene on February 16, and identified State's Exhibits Nos. 5 through 13 as those photographs. State's Exhibits Nos. 5 through 8, 12 and 13 were thereupon admitted into evidence.

Don Cravens, technical investigator for the Oklahoma City Police Department, testified that he attempted to take fingerprints at the scene of the crime but was unable to identify any of them because they were "smudged." He testified that the "entire top of his [the victim's] head had been blown off." He related that he also observed "a large portion of what [he] recognized as the brain tissue," about two feet from the body and several fragments of "skull bone and splatters of what appeared to be brain tissue," within a 30 foot radius of the body.

Jim Woodie, the arresting officer, testified that during the investigation of this incident he obtained a photograph of the defendant from the defendant's father. On February 17, the day after the homicide, Officer Woodie was summoned to a rural residence in Jones, Oklahoma, where he found the defendant asleep in a shed behind the house. The defendant was wearing clothes that fit the description given by Mrs. King on the previous day. After the defendant was arrested and transported to the Oklahoma City Police Headquarters, defendant's father, Carey Breshers, Sr., was summoned to police headquarters where defendant was to be questioned.

Mike Heath was the Oklahoma City Police Officer who questioned the defendant. He testified that after advising the defendant and his father of all their constitutional rights, he took a verbal statement from the defendant, which was later reduced to writing. This written statement, identified as State's Exhibit No. 1–A, was thereupon identified by Officer Heath as being the one which he took from the defendant, bearing the signatures of both the defendant and defendant's father, and was admitted into evidence. On that same day the witness took the defendant back to the scene of the homicide, and the defendant showed the officer where he had tied the belt, State's Exhibit No. 1, on a fence post and the farm pond where the defendant had thrown the 30–30 rifle. The belt was found at that time, and the rifle was retrieved from the pond one and a half miles north of the King residence the following day. The officer identified both items in court.

Dr. A. J. Chapman, chief medical examiner for the State of Oklahoma, testified that he performed an autopsy on the body of Clyde King on February 17. On examining the body, the witness observed that:

"[T]here was complete evulsion of the brain. That is the brain was completely torn out of the head across what we call the mid brain or just above the vital centers of the brain with the cerebellum or the center of the brain that is concerned in coordination left in the skull.

"So the cerebrum hemispheres were completely lacerated out of the skull and also

lacerated by bullet fragments and/or bone fragments. The skull itself was multiply fractured. It involved all bones and extended into all areas and the scalp was torn massively.

"The greatest distance across the wound itself in the scalp itself being about nine and a half inches."

State's Exhibit No. 13, a photograph which was identified by the witness, graphically depicted these injuries. The witness determined the cause of death to be a gunshot wound to the head which entered approximately two and a half inches above the eyebrow, traveling slightly upward and to the right. Dr. Chapman testified that the person firing the projectile would have to have been very nearly in line with the victim's line of vision.

Following this evidence, the State rested its case and the defendant's demurrer to the evidence, more properly termed a motion for directed verdict of acquittal, was overruled. Other motions relating to suppression of certain evidence, the in court identification of defendant, and dismissal for lack of jurisdiction were also overruled.

In presenting the case for the defendant, Officer Jim Woodie, Jones Police Chief Raymond Kerr and Carey Breshers, Sr., defendant's father, were called to testify in an effort to establish the involuntariness of the defendant's statement, State's Exhibit No. 1–A. Both police officers stated that when the defendant was questioned at police headquarters he was awake, alert and knew what was going on around him.

The defendant's father testified that at no time was he or the defendant advised of their constitutional rights. Further, he related that even though both he and the defendant signed the waiver of rights reflected on the written statement taken at police headquarters, neither he nor the defendant read it or understood it.

Fay Lowe, the defendant's girl friend, was next called to testify. It was established that she was the first person to come into contact with the defendant following the homicide. She related that she saw the defendant at approximately 9:00 p. m. on February 16, 1976. When she saw him she asked if he "did it," and he answered "no." She asked the defendant why he did not surrender to the police, and he replied that they would not believe him. Ms. Lowe stated that she had the defendant call the police to ask what would happen if he turned himself over to the police. She testified that she did not hear the police dispatcher's conversation because the defendant hung up the telephone, called his mother with whom he had a short conversation, and then left the premises. She did not see him again before he was arrested.

The defendant was then called to testify in his own behalf. His testimony about the events leading up to the shooting were substantially similar to Mrs. King's. However, he did state that he had not lost a calf on that day but had used that story so he could talk to the Kings, because he was lonely. After he received the belt from Mr. King, to lead his imaginary Holstein calf, he walked north to the fence row, tied the belt on a post, and walked east carrying the rifle. While walking he heard noise like a car backfiring, or a shot, turned to his left and hit a post with the barrel of the rifle which caused it to discharge. He related that his hand was not on the lever action or trigger of the weapon, nor had he cocked the lever action or pulled the trigger. Though he admitted to making and signing the written statement identified as State's Exhibit No. 1–A, the defendant testified that the statement was wrong, because he had been scared and had not known what he was saying. He testified that another reason for giving an incorrect statement was that at that time he thought the police would not believe the truth. He further related that he did not intend to harm the Kings, but that the gun "just went off by accident." He testified that he was not familiar with guns and that he was a "bad shot."

Following this testimony the defendant rested his case and moved for a directed verdict of acquittal, which was overruled. He also renewed all motions and objections made during the trial of the cause. All were again overruled.

In rebuttal, the State offered the testimony of Leon Lowe, Jr., with whom the defendant had been staying prior to the date of the homicide. Lowe's only testimony was that he had shot at targets with the defendant on several occasions.

Following closing argument, motions and jury instructions, the case was submitted to the jury for determination.

Originally, the defendant asserts that the statement taken from him and identified as State's Exhibit No. 1A, was illegally obtained as a matter of law, and that further the statement and any physical evidence found or seized as a result of said unlawful interrogation should have been suppressed.

Because the defendant was a juvenile, age 16, the dictates of 10 O.S.1971, § 1109(a), are applicable and must be strictly adhered to. Section 1109(a) states, in pertinent part:

"Questioning of children—Counsel—Prosecution by District Attorney.—(a) No information gained by questioning a child shall be admissible into evidence against the child unless the questioning about any alleged offense by any law enforcement officer or investigative agency, or employee of the court, or the Department is done in the presence of said child's parents, guardian, attorney, or the legal custodian of the child, and not until the child and his parents, or guardian, or other legal custodian shall be fully advised of their constitutional and legal rights, including the right to be represented by counsel at every stage of the proceedings, and the right to have counsel appointed by the court and paid out of the court fund if the parties are without sufficient financial means; provided, however, that no legal aid or other public or charitable legal service shall make claim for compensation as contemplated herein."

The record reflects that five witnesses were called at the beginning of trial for the purpose of an in camera hearing to determine the voluntariness of the defendant's written statement. The defendant and his father testified that they were not instructed on their constitutional rights before questioning, nor did they read or understand the admonition reflected in the first paragraph of State's Exhibit No. 1-A. They related that they both could read, but were so distraught at the time of questioning that they were unable to make an intelligent waiver.

Chief of Police of Jones, Oklahoma, Raymond Kerr, and Officers Heath and Woodie, of the Oklahoma City Police Department, testified that the defendant was orally advised of his constitutional rights at the time of arrest but was not asked any questions at that point. They related that at the time of defendant's arrest he was asleep and in a weakened condition, but that by the time they arrived at Jones Police Headquarters, he was alert and knew what was going on around him. After arriving at the Oklahoma City Police Department, the defendant was again advised of his rights, and he replied that he understood them. When the defendant's father arrived, they were seated together and orally read the following admonition which appears at the top of State's Exhibit No. 1-A:

"DATE: February 17, 1976 PLACE: OCPD, Homicide & Robbery Det. TIME; 11:30 AM. RELATIVE TO: HOMICIDE OF CLYDE JESSIE KING, WM/65 OCCURRING: 12:30 PM 2/16/76, 11500 Spencer Jones Rd., OKC.

"*I, the undersigned,* CAREY LONNELL BRESHERS, JR., *of* 901 N.E. 67th Street, OKC, *being* 16 *years of age, born at* Los Angeles, California *on* 10/22/59, *do hereby make the following state-to* MIKE HEATH, JIM WOODIE, TED GREGORY & CAREY LONNELL BRESHERS SR., *they having first identified themselves as* POLICE OFFICERS & FATHER, *knowing that I may have an attorney in my behalf present and that I do not have to make any statement nor incriminate myself in any manner. I make this statement voluntarily, of my own free will, knowing that such statement could later be used against me in any court of law, and I declare that this state-*

*ment is made without any threat, coercion, offer of benefit, favor or offer of favor, leniency or offer of leniency by any person or persons whomsoever, and that if I cannot afford an attorney, that one will be appointed by the court free of charge. I also understand that I may stop answering questions at any time that I desire, or stop the questioning for the purpose of consulting an attorney."*
(Emphasis original)

Following this, the defendant answered all questions put to him and then both the defendant and his father signed the statement, after looking it over for several minutes.

Considering the foregoing facts, this Court is of the opinion that all the dictates of 10 O.S.1971, § 1109, were complied with by the officers, and further, the fact that their signatures appear on the statement containing the aforementioned admonition is prima facie evidence that all constitutional and statutory requirements were adhered to. See generally, *J. T. P. v. State*, Okl.Cr., 544 P.2d 1270 (1975).

Second, the defendant argues that the trial court erred in overruling his timely motion for a mistrial when a State's witness interposed evidence of another crime in making a nonresponsive answer to the question on cross-examination. The defendant bases this assertion of error on the fact that the answer was made in bad faith and without provocation, thereby prejudicing his right to a fair and impartial trial. The complained of reply appears in the transcript of trial as follows:

"Q. Take that stand.
"Officer, I will show you what has been previously marked as State's Exhibit No. 3 and ask if you can identify that item?
"A. Yes, sir. This the weapon recovered by the divers.
"Q. You stated you observed them to bring that out; is that correct?
"A. Yes, sir, that is correct.
"Q. Did you then take custody of that?
"A. Yes, sir, I did.
"MR. FLAUGHER: Your Honor, the State would move to introduce State's Exhibit No. 3.

"MR. ALBERT: Your Honor, may I ask a preliminary question?
"THE COURT: Yes, sir.
"Q. (By Mr. Albert) Officer, what kind of weapon is that?
"A. (By the Witness) It's a 30–30 lever action Winchester rifle, sir.
"Q. All right. Did you put your mark on that weapon?
"A. No, sir, I did not but I have the serial number memorized.
"Q. You memorized the serial number?
"A. Yes, sir.
"Q. What was the purpose of memorizing the serial number?
"A. So that I wouldn't have to mark this property up. This is a stolen rifle and I did not want to mark this property up, sir."

As this Court noted in *Holt v. State*, Okl.Cr., 506 P.2d 561 (1973), we would have to indulge in speculation to ascertain the jury's perception of the statement. Therefore, generally we look to the excessiveness of the punishment and the weight of the evidence. See, *Wald v. State*, Okl.Cr., 513 P.2d 330 (1973). However, in the case at bar the penalty is fixed by statute and therefore not helpful in this discussion; but, the record reveals the jury was admonished and polled as to their ability to strike the officer's response relating to the "stolen rifle." Each juror responded that the statement could be stricken from his memory. By polling the jury, the trial judge preserved the jurors' perception and disposition of the statement, thereby greatly aiding our consideration of this issue. It is our opinion that the statement was unsolicited and its prejudicial effect is difficult to determine. We cannot say, in light of the instructions of the trial court (discussed infra), that this evidentiary harpoon was harmless.

As his third assignment of error, the defendant argues that certain color photographs should not have been allowed into evidence for the reason that they had no probative value but were introduced for the

sole purpose of inflaming the passion and prejudice of the jury. The color photographs, identified as State's Exhibits Nos. 12 and 13, are graphic color photographs of the decedent showing the open skull and severed brain of the victim lying on the ground, an admittedly gruesome scene. We presume the pictures were admitted by the trial court to show the location of body, the wound, and the position of the body and wound in relation to the location from which where the bullet was fired. However, none of these facts were at issue in this case. In reviewing the admissibility of photographs, this Court must weigh the photographs' probative value against the possible prejudice resulting therefrom to the defendant. In this case, at most, the photographs corroborated the testimony both of the defendant's testimony and of the State's witnesses. As the probative value of the photographs was slight and their prejudicial effect could be great, we cannot say that the admission of these photographs was not error.

As defendant's fourth assignment of error, he asserts that it was error for the trial court to refuse to give his requested instructions on the lesser included offenses of first and second degree manslaughter as well as his requested instruction on reckless conduct while in possession of any shotgun, rifle or pistol. Considering the results reached herein, we find it unnecessary to discuss this assignment of error.

■ The defendant's fifth assignment of error is that the trial court erred in permitting the testimony of a State's witness to the effect that no tests were performed on the homicide weapon, because such tests were considered unnecessary inasmuch as all standard operating procedures had been followed. The defendant further asserts that the witness was not qualified to testify about the weapon. Citing *Harvell v. State*, Okl.Cr., 395 P.2d 331 (1964), for the definition of an expert witness, the defendant argues that the officer, not being an expert, invaded the province of the jury in testifying as to the weapon's fitness. The testimony given by the officer was that which

would be familiar to anyone versed in the use of firearms, i. e., how to fire a firearm which is of a common make, model and caliber. Therefore, it was not error to admit the testimony complained of.

■ Finally, the defendant asserts that the trial court erred in overruling his timely motion to quash the information. This assertion amounts to an argument that the evidence was insufficient to sustain a conviction. It has been the time honored rule of this Court that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty, this Court will not interfere with that determination upon the grounds that the evidence was insufficient, even though it might be conflicting. *Moore v. State*, Okl.Cr., 553 P.2d 209 (1976).

■ Finding prejudicial error in the admission of the evidentiary harpoon and certain of the photographs, but at the same time recognizing the volume of evidence against the defendant, it is the opinion of this Court that the interests of justice will be served best by vacating the judgment and sentence for Second Degree Murder and remanding this case to the District Court with instructions to enter a new judgment and sentence finding the defendant guilty of Manslaughter in the First Degree and imposing sentence on defendant of twenty-five (25) years under the direction and control of the Department of Corrections. The new judgment and sentence is to be made available to the Warden of the State penitentiary and the Department of Corrections who shall correct their records to reflect the modification of the judgment and sentence herein. As *MODIFIED* the judgment and sentence is *AFFIRMED*.

BUSSEY, P. J., concurs in results.

CORNISH, J., dissents.

BUSSEY, Presiding Judge, concurs in results:

After considering the totality of the evidence, including the statement given to the

officers by the defendant, wherein he acknowledged that he shot the deceased but could give no reason for doing so, I am of the opinion that the facts support a conviction for Manslaughter in the First Degree and justify a sentence of twenty-five years. The defendant committed a misdemeanor when he whirled and fired the rifle in the direction of the deceased at a distance of eighty yards. He was not an expert marksman, and the record is devoid of any evidence or circumstances tending to support the conclusion that the homicide was committed with the premeditated design to effect the death of the deceased. Clearly this falls within the purview of 21 O.S.1971, § 711:

> "Homicide is manslaughter in the first degree in the following cases:
>
> "1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor. . . ."